**ARKIE LURES, INC., Plaintiff–Appellee,**

v.

**GENE LAREW TACKLE, INC., Defendant–Counterplaintiff/Appellant,**

v.

**Bob D. CARNES, Counterdefendant–Appellee.**

No. 96–1239.

United States Court of Appeals, Federal Circuit.

July 8, 1997.

Rehearing Denied; Suggestion for Rehearing In Banc Declined Sept. 11, 1997.

---

Boyd D. Cox, Fayetteville, AR, argued for plaintiff-appellee and counterdefendant-appellee. With him on the brief was Michael H. Mashburn, Mashburn & Taylor, Fayetteville, AR. Of counsel on the brief was Bill Putman, Jr., Mashburn & Taylor, Fayetteville, AR.

Gary Peterson, Pray, Walker, Jackman, Williamson & Marlar, Oklahoma City, OK, argued for defendant-counterplaintiff/appellant.

Before ARCHER, Chief Judge, NEWMAN and MICHEL, Circuit Judges.

Opinion for the court filed by Circuit Judge PAULINE NEWMAN. Dissenting opinion filed by Circuit Judge MICHEL.

PAULINE NEWMAN, Circuit Judge.

Gene Larew Tackle, Inc. (herein Larew) appeals the summary judgment of the United States District Court for the Western District of Arkansas,[1] declaring invalid United States Patent No. 4,530,179 (the '179 or Larew patent) entitled "Salt Impregnated Fishing Lure." We reverse the judgment of invalidity and remand for determination of the remaining issues.

## BACKGROUND

Gene Larew, a retired engineer, set out to make a plastisol fishing lure that would have a salty taste for a prolonged period in water, as compared with the salty baits then known. It is explained in the Larew patent that a striking fish will retain a salty-tasting lure for a longer time, thereby improving the fisherman's chance to set the hook.

Mr. Larew's attempts to develop and manufacture a plastic salty lure encountered great skepticism within the fishing lure trade. Although he had made samples by hand he was rebuffed by manufacturers of plastic lures, who expressed strong doubts

---

1. *Arkie Lures, Inc. v. Gene Larew Tackle, Inc. v. Bob D. Carnes,* 912 F.Supp. 422, 38 USPQ2d 1300 (W.D.Ark.1996).

about the feasibility of manufacturing such a device, as well as doubts about its properties if it could be made. Two such manufacturers testified on Larew's behalf in response to Arkie Lures' motion for summary judgment. They explained that salt is an undesirable additive for a plastic lure because it tends to roughen the smooth texture of the surface of the lure; that the presence of salt reduces the tensile strength of the plastic, rendering the lure susceptible to tearing and interfering with its flexibility; and that it is unsafe to mix chemicals such as salt with plastic, because such mixing can cause violent explosions.

Upon extreme persistence by Mr. Larew the product was eventually produced. The first commercial salt-impregnated plastic lure was called the "Gene Larew Salty Frog." It was an immediate commercial success. Arkie Lures copied the Larew lure and, declining Mr. Larew's offer of a license, brought this declaratory judgment action. The district court granted Arkie Lures' motion for summary judgment of invalidity, concluding that Larew's invention was "not sufficiently different" from the prior art as to render it nonobvious. This appeal followed.

## DISCUSSION

### A. Standard of Review

An issue may be decided by summary judgment when no material question of fact is in dispute, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986), or when it is shown that the nonmovant can not prevail even on its version of the facts, thus rendering a trial futile. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Allied Colloids, Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1573, 35 USPQ2d 1840, 1841 (Fed.Cir.1995). The party moving for summary judgment bears the initial burden of coming forward with evidence that demonstrates the absence of a genuine material question of disputed fact and establishes that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When

the movant has met this initial burden the non-movant must come forward with sufficient evidence to show that, on the non-movant's evidence, the movant is not entitled to judgment as a matter of law. *Id.* at 322–24, 106 S.Ct. at 2552–53. We review *de novo* the district court's grant of summary judgment. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53; *Seal–Flex, Inc. v. Athletic Track and Court Construction*, 98 F.3d 1318, 40 USPQ2d 1450 (Fed.Cir.1996).

### B. The Obviousness Criteria

■ The Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966) explained that in determining obviousness under 35 U.S.C. § 103 four kinds of factual inquiries are conducted: the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the field of the invention, and any objective indicia such as commercial success, long felt need, and copying. In *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 872, 228 USPQ 90, 98 (Fed.Cir. 1985) the Federal Circuit elaborated:

> In patent cases, the need for express *Graham* findings takes on an especially significant role because of an occasional tendency of district courts to depart from the *Graham* test, and from the statutory standard of obviousness that it helps determine, to the tempting but forbidden zone of hindsight.

Larew states that the district court failed to consider all of the *Graham* factors, improperly found facts on summary judgment, and erred in its conclusion. Arkie Lures responds that there was no genuine dispute as to any of the *Graham* factors, but only a dispute as to the legal conclusion of obviousness. We review the subject matter before the district court in order to ascertain whether summary disposition was available and, if so, whether it was correctly granted.

#### 1. Scope and Content of the Prior Art

The district court determined, and we agree, that there was no dispute as to the scope and content of the prior art. The use

of salty bait to catch fish was known, plastisol lures were known, and the prior art showed the use of organic fish attractants in plastic lures (while cautioning against insoluble attractants). No reference showed or suggested a plastisol salty lure.

Included in the prior art was a 1972 article entitled "Spice Up Your Lures," which stated that fish "taste" the lure before biting. The *Modern Book of the Black Bass,* published in 1972, described the use of salted pork rind as bait. United States Patent No. 3,079,722 to Greenlee described a fishing fly formed from squirrel hair with yeast and salt baked in, and explained that salt is an attractant to fish. United States Patent No. 2,979,778 to FitzSimons described a plastic lure containing an organic fish attractant, preferably rhodinyl acetate; this reference warned against the use of insoluble additives in plastic lures. A patent to Orn suggested as lure additives fish attractants having "the flavor or odor of natural bait." The record states that frozen salted minnows have been used to catch trout. The literature on fishing lures is apparently quite extensive, but despite the long use of salty lures and plastic lures, no reference was cited that showed or suggested this combination.

### 2. *Differences Between the Prior Art and the Claimed Invention*

Larew stressed four principal differences from the prior art: 1) the Larew lure works not by odor, like the attractant-carrying lures of the FitzSimons and other references, but because of its salty taste whereby it is mouthed by a striking fish for a longer period of time, thereby increasing the chance to hook the fish before it rejects the bait; 2) the salt-impregnated plastisol retains its salty taste for the life of the lure and does not spoil, unlike known salty baits such as pork rind, which lose their salt in water and rot in storage; 3) manufacture of the salt-impreg-

nated plastisol was widely thought to be unfeasible or unsafe, and the prior art warned against the addition of solid additives; and 4) the salt was expected to roughen the surface of the plastic as well as change its texture, making it susceptible to tearing and also reducing the action of the lure.

There was no material dispute as to the nature of the differences between the prior art and the claims of the '179 patent.[2] Although the evidence was not free of argument, it was not disputed that no prior art reference showed a plastic salty lure, and that the differences that are reported are factually correct.

### 3. *Level of Ordinary Skill in the Field of the Invention*

 The decision of obviousness *vel non* is made not from the viewpoint of the inventor, but from the viewpoint of a person of ordinary skill in the field of the invention. *Kloster Speedsteel AB v. Crucible, Inc.,* 793 F.2d 1565, 1574, 230 USPQ 81, 86 (Fed.Cir.1986); *see generally Environmental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693, 697, 218 USPQ 865, 868–69 (Fed.Cir.1983) (identifying criteria relevant to determination of the level of ordinary skill). The purpose is to assure an appropriate perspective of the decisionmaker, and to focus on conditions as they existed when the invention was made. Good ideas may well appear "obvious" after they have been disclosed, despite having been previously unrecognized.

Larew submitted the affidavit testimony of two persons skilled in the manufacture of plastic lures, Glen Carver and Hugh Harville. Carver was described by the district court as having "an M.S. in biology and chemistry and a Ph.D. in biology and was the head of the biology department at McNeese State." In the 1970s Dr. Carver was a consultant to the fishing tackle industry and helped develop the injection-molding process that is the

---

**2.** Claim 1 is the broadest claim:

 1. In a fishing lure comprising a body part and at least one hook part connected thereto, the improvement wherein said body part is formed of a plastisol of a resin dispersed in an organic solvent, said plastisol being impregnated with sufficient salt to impart a salty taste to said body part.

Other claims are specific to the use of a vinyl chloride resin, a diester plasticizer, and various concentration limitations including the presence of salt in the amount of about one pound per 5–20 gallons of plastisol. Larew objects that the district court did not distinguish among the claims.

dominant process for producing soft-bodied plastisol fishing lures. Despite Carver's high level of skill, he described his extreme skepticism of the feasibility of Larew's idea, and his belief that a satisfactory product could not be produced.

Mr. Harville was a custom manufacturer of soft-bodied plastic fishing lures. He described his concerns for manufacturing safety, his skepticism as to feasibility, and his expectation that the surface would be roughened and weakened, destroying the lure's efficacy. He described the extraordinary precautions he took upon first attempting to combine the ingredients in accordance with Mr. Larew's formulations.

The evidence showed the complexity of the plastic fishing lure art. Those in the field of the invention viewed Larew's invention not as a simple concept of adding salty taste to a known lure, but as a complex combination requiring experience of fishing and fishing lures and the technology of plastics.

### 4. Objective Indicia

■ In *Graham* the Supreme Court explained that the public and commercial response to an invention is a factor to be considered in determining obviousness, and is entitled to fair weight. 383 U.S. at 35–36, 86 S.Ct. at 702–03, 148 USPQ at 474. The so-called "secondary considerations" provide evidence of how the patented device is viewed by the interested public: not the inventor, but persons concerned with the product in the objective arena of the marketplace. In this case the considerations of commercial success, licensing activity, and copying were markedly prevalent, and were not disputed. Such aspects may be highly probative of the issue of nonobviousness. This court wrote in *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538–39, 218 USPQ 871, 879 (Fed.Cir.1983):

> Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the deci-

sionmaker remains in doubt after reviewing the art.

Larew presented evidence of the rapid growth of its business and the numerous licenses granted. Dr. Carver and Mr. Harville testified that Larew's lure "revolutionized" the industry. Ready recognition of the merits of a new product does not establish obviousness. Commercial success and copying are tributes to ingenuity, not evidence of legal obviousness. This rule is no less worthy when the new product narrowly fits into a field already well explored—like the fishing lure art—than when a transcendent scientific breakthrough is launched. The patent law is designed to serve the small inventor as well as the giant research organization.

### C. The Obviousness Determination

We apply the law of obviousness to the undisputed *Graham* factors.

No prior art showed or suggested the combination of a plastisol lure with salt, although the prior art was extensive as to the separate elements, and suggested including organic attractants in plastic lures. Instead, the prior art, and the experts, counselled against the Larew combination. The references before the district court, such as the *Modern Book of the Black Bass,* suggest using salted pork rind or other salty baits, not the incorporation of salt into a plastisol. And FitzSimons, who shows the addition of organic attractants to the plastisol lure, strongly cautions against the addition of plastic-insoluble additives.

The question is not whether salt "could be used," as the district court concluded, but whether it was obvious to do so in light of all the relevant factors. The beliefs of those in the field at the time, including beliefs that the plastisol lure would lose its surface qualities, texture, and strength, as well as the manufacturing uncertainties, are the position from which the decisionmaker must view the invention.

■ It is insufficient to establish obviousness that the separate elements of the invention existed in the prior art, absent some teaching or suggestion, in the prior art, to combine the elements. Indeed, the years

of use of salty bait and of plastic lures, without combining their properties, weighs on the side of unobviousness of the combination. Mr. Larew persisted against the accepted wisdom, and succeeded. The evidence that the combination was not viewed as technically feasible must be considered, for conventional wisdom that a combination should not be made is evidence of unobviousness. *See In re Hedges,* 783 F.2d 1038, 1041, 228 USPQ 685, 687 (Fed.Cir.1986) (proceeding against accepted wisdom is evidence of unobviousness). Whether some plastics manufacturers knew how to mix salt and plastisol, as was argued to the district court, did not make it obvious to proceed against the general view in the field of plastic fish lures. FitzSimons' warning against adding plastic-insoluble ingredients to the plastisol was repeated by Dr. Carver and Mr. Harville, and Mr. Larew was so advised long before this litigation arose. Further, these artisans of the plastic lure believed that salt would affect the surface, texture, and strength of the lure. Larew's eventual demonstration that the desired product could indeed be successfully made did not render it obvious, nor did the ready appreciation of its value render it unpatentable.

The district court's statement that "secondary considerations are just that—secondary," suggests a misperception of the role of these considerations in determination of the ultimate question. The record shows the strong commercial recognition of this seemingly simple invention. Although the district court concluded that "The fact that Larew was the first to try this obvious possibility and found that there is more consumer demand than one might think does not mean he was being inventive," this invokes an incorrect standard. On the correct standard, we look to the state of relevant knowledge at the time of Larew's activities, including concern for the quality of the product, the warnings, and the perceived manufacturing difficulties, all manifested in the widespread skepticism that Mr. Larew encountered among those of skill in the field.

The conclusion of obviousness was in error, and is reversed. The case is remanded to the district court for further proceedings.

Costs to Larew.

*REVERSED AND REMANDED.*

MICHEL, Circuit Judge, dissenting.

I respectfully dissent. The district court correctly held, in a thorough and well-reasoned opinion, that United States Patent No. 4,530,179 ("the '179 patent"), issued in 1985, was invalid because the fishing lure it claims would have been obvious under 35 U.S.C. § 103 in light of the prior art before the district court. I would not overturn that decision and do not believe the majority has shown a basis for doing so.

The '179 patent has 20 claims. Only three of the claims—1, 11, and 20—are independent. Claim 1 reads as follows:

In a fishing lure comprising a body part and at least one hook part connected thereto, the improvement wherein said body part is formed of a plastisol of a resin dispersed in an organic solvent, said plastisol being impregnated with sufficient salt to impart a salty taste to said body part.

Claim 11 reads as follows:

A body for a fishing lure in the form of a soft-bodied animal, said body being formed of a plastisol of a resin dispersed in an organic solvent, said plastisol being impregnated with sufficient salt to impart a salty taste to said body part.

Claim 20 reads as follows:

A body for a fishing lure in the form of a soft-bodied worm, frog or lizard, said body being formed of a resilient plastic material impregnated with sufficient salt to impart a salty taste to said body part, said plastic material being substantially free of organic fish attractant.

The dependent claims contain additional limitations, concerning, for example, the shape of the lure, the type of plastisol, and the amount of salt.

The '179 patent itself admits that all of the elements of the claimed invention, other than the addition of salt to a conventional plastisol lure, were known in the art. For example, the patent specification states the following:

Conventional fishing lures having soft plastic bodies are well known. Such lures are

frequently formed as worms, frogs, lizards, small fish or the like. In addition to the body part, such lures include a hook part, comprising one or more hooks, and an attachment part for attaching the lure to the line.... In some instances, such lures include an odorant which produces a scent to attract fish.

Col. 1, ll. 8–22.

The plastisol is formulated and heated according to known techniques for controlling the properties of plastisols, to give the lure body a desired degree of resilience and tensile strength.

Col. 2, ll. 3–6.

With respect to the limitation of claim 20 regarding the absence of "organic fish attractant," the "Background of the Invention" section of the '179 patent recognizes this limitation was present in the prior art. There, the patentee discussed the use of conventional plastic lures that attract fish due to their physical resemblance to frogs, insects or other animals, their "flash" as they move through the water and the sound waves they create. Col.1, ll. 8–22. The patentee also disclosed that, "[i]n some instances," odorants could be added. Col. 1, ll. 21–22. It is inferable that at least the conventional lures without odorants did not contain organic attractants. With respect to the limitation regarding the use of an organic solvent to disperse the plastic, the patent discloses that "[m]any different plasticizers may be used in the plastisols, and may be chosen in accordance with known criteria to provide proper physical properties...." Col. 2, ll. 20–25. Moreover, one of the solvents explicitly disclosed by Larew is also disclosed by the prior art, United States Patent No. 2,979,778 to FitzSimons ("the '778 patent").

Therefore, the only new element is the addition of salt as a non-organic attractant. However, it is beyond dispute that it was known in the prior art that fish are attracted to certain smells and tastes. As discussed by the district court, the '778 patent clearly discloses that fish are attracted to certain tastes. An object of the invention of the '778 patent was to "provide a method for making an artificial lure having an odor and texture that duplicates, as nearly as possible, the odor and texture *or taste* of natural bait." In hypothesizing why the invention was successful, the '778 patent states that the fish appeared to not be discouraged by one unsuccessful nibble but instead returned in an effort to consume the entire bait, likely "attributable to the fact that the texture of the plastic body simulates the taste of the nymph, while the attractant simulates its odor." Likewise a 1972 article states that fish depend heavily on their senses of smell and taste. Richard Martin, "Spice Up Your Lures," *Outdoor Life*, December 1972 at 80. This article also discloses that one study showed that certain fish are "able to detect salt and sugar in truly miniscule amounts." *Id.* at 127. Although not discussed by the district court, United States Patent No. 3,854,234, cited in the '179 patent, discloses an artificial bait with a doughball-type core incorporating cheese, animal by-products, corn syrup or cereal grain which "emits enticing and tantalizing odors and a flavor source known to be savory and attractive to fish."

Moreover, the prior art demonstrates that the particular substance used as a flavor source in this invention—salt—was a known fish attractant. For example, in Byron Dalrymple, *Modern Book of the Black Bass* 90 (1972), the author states:

Salt is definitely an attractor. This is thought to be the reason that solutions used to preserve such items as pork rind, which contain much salt, are actually an attractor. I have caught dozens of bass with fly-fishing tackle using a small strip of pork rind taken from a salt solution and impaled on a bare hook. I have watched many of them take the lure. They approach, appear to sniff or evaluate it, then inhale it.

Also, United States Patent No. 3,079,722, issued in 1963, discloses a fishing lure with an inner body portion consisting of water, yeast, salt and squirrel hair. When the inner body becomes moist, it "emits a peculiar odor which is very effective in attracting fish to the lure." Additionally, an entry entitled the *Salted Dynamite for Lunker Trout,* in *The 1974 Sports Afield Almanac* (Ted Kesting ed., 1974) discloses that one method of catch-

ing bigger fish is to add salt to minnows and freeze before use. The almanac further states "[r]eal monster trout will take those salt-flavored minnows as if they are going out of style." *Id.*

Thus, it was well-known in the art that fish were attracted by certain smells and tastes and that salt was just such an attractor, even in small quantities. In light of this prior art, the district court correctly held that the '179 patent is invalid for obviousness.

I believe the strongest argument presented by Gene Larew Tackle, Inc. ("Larew") and the majority opinion in favor of reversing the district court is that the prior art taught away from adding salt to a plastic lure. Larew argues the '778 patent "specifically cautioned against the use of any plastic-*insoluble* additive as a fish attractant in his plastisol lure." Larew also points to the testimony of two witnesses who testified that they were afraid a violent reaction, even an explosion, might occur if a foreign substance was added to the plastisol.

This argument, however, does not change my view of the correct outcome. The '778 patent actually says only that "[w]hile a wide variety of attractant materials are available, it is *desirable* that the oil or other attractant be *miscible* in the plasticizer." Thus, it does not specifically caution against the use of salt, but only suggests the use of a miscible, *i.e.*, a mixable, material is more desirable. Salt is miscible in plastic, at least long enough to pour the lures, as evidenced by the success of the salty lures. It is not required to be soluble. Thus, the '778 patent does not teach away from the invention of the '179 patent.

As for the testimony of the witnesses, which we assume to be true on summary judgment, such testimony is insufficient to overcome the overwhelming evidence of obviousness before the district court. Those of skill in the art had been adding a variety of substances to plastic lures for quite some time, *see, e.g.,* the '778 patent, and Larew has failed to point to any evidence which would demonstrate that salt was thought to be any different than any of the other additives. Moreover, the trial court found that the record demonstrated as a matter of law that two

other individuals had added some quantity of salt to their lures, either as a filler or to keep the mold from sticking, without ill effect.

Likewise, even when the evidence of secondary indicia of obviousness is considered, as it must be, my view of the correct result is not changed. Even where such evidence exists, it may not be compelling enough to overcome the strong showing of obviousness in light of the prior art. *See B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.,* 72 F.3d 1577, 1583, 37 USPQ2d 1314, 1318–19 (Fed. Cir.1996) ("Considering the minor differences between the claimed invention and the teachings of [the prior art], the secondary considerations were not sufficiently compelling."). This is such a case.