NEWMAN, Circuit Judge,
concurring in part, dissenting in part.
I agree that inequitable conduct has not been shown. However, the court errs in three major areas, misconstruing established law. First, the court creates a new “written description” requirement for limitations in claims, a requirement with inn portant consequences for patent content and; prosecution, and that will taint large numbers of issued patents.
The panel majority also holds that the disclosure in a parent patent is a reference against the common disclosure in a continuation-in-part patent, again tainting many properly granted patents.
The panel majority also holds that most of the claims in suit are invalid on the ground of obviousness over references that explicitly teach away from the inventions in the Phillips patents. In the district court, the experts for both sides agreed that for oral dosage of PPIs the protective enteric coating was understood to be essential. Only the panel majority finds that the extreme conditions that the prior art deemed necessary for oral dosage of uncoated PPIs, would be acceptable for patient treatment.
The court’s new rulings are contrary to statute, precedent, and common sense. They simply add to the unreliability of duly granted patents, in new and unacceptable ways.
I
Written description
The claims of the '772 patent (U.S. Patent No. 7,399,772) contain the limitation that these uncoated PPI formulations do not contain the known therapy sucralfate. I agree that the district court clearly erred in finding that since the specification did not contain evidence of “contraindication” of sucralfate, the patent failed the written description requirement. On appellate review, correction of this erroneous finding is all that is needed.
However, my colleagues add a gratuitous fillip, and devise the new rule that the specification must “describe a reason” for the claim limitation, or the claims are invalid on written description grounds. *1359 Maj. op. at 1351 (“Negative claim limitations are adequately supported when the specification describes a reason to exclude the relevant limitation.”). That is not correct. Negative claim limitations may often be appropriately stated in claims although the reason for the limitation is not set forth in the specification.
Negative limitations to claims may arise in a variety of circumstances. For example, a negative limitation may be prudently placed in a claim in response to an examiner’s rejection, perhaps to distinguish a reference that was given its “broadest reasonable interpretation” for purposes of examination. See,-.e.g., In re Skvorecz, 580 F.3d 1262, 1268 (Fed.Cir.2009) (“Applicant always has the opportunity to amend the claims during prosecution, and broad interpretation by the examiner reduces the possibility that the claim, once issued, will be interpreted more broadly than is justified.” (quoting Manual of Patent Examining Procedure (MPEP) § 2111)).
A claim limitation may distinguish the prior art although the reason is not in the specification. Claims are routinely adjusted during prosecution in the Patent and Trademark Office. As stated in In re Johnson, 558 F.2d 1008, 1018 (CCPA 1977), “applicants frequently discover during the course of prosecution that only a part of what they invented and originally claimed is patentable.” This adjustment may include limitations that respond to the prior art developed by the examiner and traversed by the applicant. The specification need not foresee and describe the reason for every possible examination response.
As another example of routine patent procedures, there may be situations in which comparative data are provided during prosecution in order to respond to an examiner’s rejection, see MPEP § 716, and the distinction from the prior art may lead to a claim limitation. The need for the limitation may not have been apparent when writing the specification. For example, in In re Johnson, supra, the court held that the claims could be limited during prosecution in order to avoid subject matter lost in an interference; the court explained that: “It is for the inventor to decide what bounds of protection he will seek.” 558 F.2d at 1018.
The applicant’s obligation is to describe and claim the invention in accordance -with 35 U.S.C. § 112. Thereafter, patent examination may lead to amendments to the claims. The MPEP § 2173.05© advises that: “If alternative elements are positively recited in the specification, they may be explicitly excluded in the claims.” The MPEP does not require that the reason for such exclusion must be stated in the specification. The panel majority creates a new and far-reaching ground of invalidity, a ground that received no deliberation and advice from the concerned communities.
Further, this new requirement for patent specifications is not an issue in this case, for the '772 specification states that sucralfate, “possibly the ideal agent for stress ulcer prophylaxis, [citing references],” is known to have occasional adverse effects, and that “the only patient whose death was attributed to stress-related upper gastrointestinal bleeding was in the sucralfate arm.” '772 patent, col.4 11.1-29. Thus the reason for excluding sucralfate was indeed stated in the specification. Nonetheless, the district court held that evidence of “contraindication” of sucralfate was required.
I agree with the panel majority that the Phillips invention was adequately described, and that the district court erred in its requirement. “Compliance with the written description requirement is essentially a fact-based inquiry that will ‘necessarily vary depending on the nature of the *1360 invention claimed.’ ” Enzo Biochem v. GenProbe, Inc., 296 F.3d 1316, 1324 (Fed.Cir. 2002) (citation omitted). The panel majority is incorrect in its new general requirement that the reason for any negative limitation must be included in the specification, on pain of invalidity under § 112. This new ground of invalidity ignores the factual nature of the written description requirement, and impugns the presumption of validity of a duly granted patent. The court’s new rule simply adds to the uncertainty of the patent grant, to the detriment of invention and commerce.
II
The parent patent as prior art
The panel majority creates another new ground of invalidity, in holding that the common disclosure in a parent patent is prior art to the chain of continuing patents. The court incorrectly holds that the parent '737 patent (U.S. Patent No. 5,840,-737) that issued to Dr. Phillips is an invalidating reference based on the common subject matter that has priority to the parent patent’s filing date.
The claims at issue all include subject matter disclosed in the '737 patent, subject matter for which priority was properly claimed, with no breaks in the chain of filings. It is beyond debate that the common subject matter in a chain of copending applications is entitled to priority from the earliest application disclosing the common subject matter. See, e.g., Herbert F. Schwartz & Robert J. Goldman, Patent Law & Practice § 2.III.D.7.C (6th ed. 2008) (“A continuation-in-part is entitled to the parent’s filing date as to any subject matter in common, but only to its own filing date as to the new matter.”); James E. Hawes, Patent Application Practice § 18:5.50 (Rel.27, 2011) (“The parent’s filing date will apply to all the material in the child [CIP] that was in the parent, but the new material will not be accorded the benefit of the parent’s filing date.”); Irah H. Donner, Patent Prosecution: Law, Practice, and Procedure 156 (7th ed. 2011) (“The CIP application priority date is the same as that of the earlier-filed application for subject matter common to the two applications.”).
Ignoring this basic tenet of patent law, the panel majority uses the common subject matter from the '737 patent to invalidate many of the claims-in-suit. The panel majority describes this common subject matter at length, but instead of understanding that the common subject matter supports the claims that are entitled to the priority of that subject matter, the panel majority holds that the common subject matter invalidates the claims to that subject matter.
For example, the panel majority goes into detail for the '885 patent (U.S. Patent No. 6,699,885), ruling that because the claims in the '885 patent are supported by the common subject matter in the parent '737 patent, the claims in the '885 are rendered obvious by the parent '737 patent.
Priority for the '885 patent was properly claimed, in accordance with 35 U.S.C. § 120, as follows:
This application is a continuation-in-part of U.S. patent application Ser. No. 09/901,942, filed on Jul. 9, 2001, which is a continuation-in-part of U.S. patent application Ser. No. 09/481,207, filed on Jan. 11, 2000, now U.S. Pat. No. 6,489,-346, which is a continuation-in-part of U.S. patent application Ser. No. 09/183,-422, filed on Oct. 30, 1998, now abandoned, which is a continuation-in-part of U.S. patent application Ser. No. 08/680,-376, filed on Jul. 15, 1996, now U.S. Pat. No. 5,840,737, which claims priority to U.S. Provisional Application Ser. No. 60/009,608 filed on Jan. 4, 1996. This application claims priority to all such *1361 previous applications, and such applications are hereby incorporated herein by reference.
'885 patent, col.l 11.4-16. There is no break in the chain of priority. The panel majority correctly observes that the '737 patent describes the subject matter claimed in the '885 patent. The '737 patent describes the combination of the PPI and a Group IA metal salt, as follows:
The present invention further includes a pharmaceutical composition for making a solution/suspension of omeprazole or other substituted benzimidazoles and derivatives thereof, which consists essentially of omeprazole or other substituted benzimidazoles and derivatives thereof and a bicarbonate salt of a Group IA metal in a form convenient for storage, whereby when the composition is placed into a aqueous solution, the composition dissolves yielding a solution/suspension suitable for enteral administration to a subject. The pharmaceutical composition is in a solid form prior to dissolution in the aqueous solution. The omeprazole or other substituted benzimidazoles and derivatives thereof and bicarbonate can be formed into a tablet, capsule, or granules, by methods well known to those skilled in the art.
'737 patent, col.10,11.20-33. The panel majority explains that the '885 subject matter is disclosed in the '737 patent, stating: “The '737 patent discloses broad ranges for the amounts of omeprazole and sodium bicarbonate that can be used, which overlap with the range of ratios of buffering agent to PPI claimed in the '885 patent.” Maj. op. at 1353. The panel majority states that the “'737 patent discloses formulating omeprazole both in conventional dosage forms (e.g., tablets, capsules, and granules) and also as an aqueous suspension of omeprazole with a buffering agent,” as claimed in the '885 patent. Maj. op. at 1352. The panel majority states that “the '737 patent teaches that the amount of sodium bicarbonate can vary between 0.75 mEq to 1.5 mEq per 2 mg of omeprazole (0.375 to 0.75 mEq per mg of omeprazole),” and observes that “this falls within the range of about 0.1 mEq to about 2.5 mEq of buffering agent per mg of PPI claimed in the '885 patent.” Maj. op. at 1353.
Focusing on claim 17 of the '885 patent, the panel majority states that: “The '737 patent also discloses claim 17’s limitation that the buffering agent be sodium bicarbonate ‘in an amount from about 1000 mg to about 2000 mg’.” The panel majority points to where the '737 disclosure shows the claim 17 dosage range of uncoated omeprazole, and where “the '737 patent teaches a range of 0.75-75 mEq of sodium bicarbonate, which overlaps with the claimed range [in the '885 patent].” Maj. op. at 1353-54. The panel majority illustrates and stresses that the subject matter of claim 17 is within the '737 patent’s disclosure.
The panel majority forgets that “matter disclosed in the parent application is entitled to the benefit of the filing date of the parent application.” Waldemar Link, GmbH & Co. v. Osteonics Corp., 32 F.3d 556, 558 (Fed.Cir.1994); see Litton Sys., Inc. v. Whirlpool Corp., 728 F.2d 1423, 1438 (Fed.Cir.1984) (“The earlier filing date of the parent application pertains to material in the C-I-P application also disclosed in the prior application. 35 U.S.C. § 120.”). Instead, the panel majority relies upon the common subject matter from the '737 patent disclosure to invalidate the '885 claims supported by that subject matter. This is incorrect, for the common subject matter in the '885 patent is entitled to the '737 filing date. That entitlement is not lost by issuance of the '737 patent. The common subject matter, properly carried forward in copending con *1362 tinuing patents, cannot be prior art against itself, as the majority holds.
Similarly, the '988 patent (U.S. Patent No. 6,645,988) states the chain of eopendency, and incorporation by reference, as follows:
This application is a continuation-in-part of U.S. patent application Ser. No. 09/481,207 filed Jan. 11, 2000, now U.S. Pat. No. 6,489,346 which is a continuation-in-part of U.S. patent application Ser. No. 09/183,422 filed on Oct. 30, 1998, now abandoned, which is a continuation-in-part of U.S. patent application Ser. No. 08/680,376 filed on Jul. 15,1996, now U.S. Pat. No. 5,840,737, which claims priority to U.S. Provisional Application Ser. No. 60/009,608 filed on Jan. 4, 1996. This application claims priority to all such previous applications, and such applications are hereby incorporated herein by reference to the extent permitted by law.
'988 patent, col.l II.4-15. There is no break in the chain, no flaw in the entitlement to priority for the common subject matter in the prior copending filings.
Similarly, the '346 patent correctly recites the chain of co-pendency. There are no breaks in the chain:
This application is a continuation-in-part of U.S. patent application Ser. No. 09/183,422 filed on Oct. 30, 1998, now abandoned, which is a continuation-in-part of U.S. patent application Ser. No. 08/680,376 filed on Jul. 15, 1996, now U.S. Pat. No. 5,840,737, which claims priority to U.S. Provisional Application Serial No. 60/009,608 filed on Jan. 4, 1996. This application claims priority to all such previous applications, and such applications are hereby incorporated by reference.
'346 patent, col.l 11.4-12.
The novel ground of invalidity here adopted was not accepted by the PTO. During examination, the patent examiner reviews the priority claims, as instructed by the Manual of Patent Examining Procedure §§ 201.08, 201.11. The examiner did not cite the '737 patent against the later applications in the chain, during either the initial examination of the continuing applications, or on the reexamination of the '885 patent during this litigation.
From the court’s incorrect ruling that the '737 patent is a reference against its common subject matter in the later applications in the chain of filings, I respectfully dissent.
Ill
Patentability — obviousness
Again ignoring the presumptions and burdens of proof for duly granted patents, the panel majority holds many of the remaining claims in the Phillips patents invalid for obviousness over the prior art. Although the expert witnesses for both sides agreed that it was uniformly understood that a protective enteric coating is essential for oral dosage, my colleagues find it obvious to omit the protective enteric coating.
Many scientists studying PPI degradation by stomach acid consistently confirmed that for practical administration the PPI must be coated with a gastric acid-resistant coating. Nonetheless, the panel majority cites these same scientific studies of PPI degradation in the stomach, and concludes that they render obvious the omission of the enteric coating. My colleagues do not mention the testimony of experts in PPI science, that the Phillips uncoated formulation was “weird,” “different,” “pretty surprising,” and “got people’s attention,” in the words of Dr. Brian Fennerty. Nor do my colleagues mention the plethora of patents and publications that uniformly stated that the PPI must be enteric coated. E.g., U.S. Patent No. *1363 4,786,505 to Lovgren and Pilbrant, col.l 11.48-51 (“In order to obtain a pharmaceutical dosage form of omeprazole which prevents omeprazole from contact with acidic gastric juice, the cores must be enteric coated.”).
The panel majority cites a study of stomach acid degradation of PPI led by Dr. Pilbrant, and ignores their conclusion that for oral administration the PPI must be enteric coated. This study by Pilbrant and Cederberg, “Development of an oral formulation of omeprazole,” 20 Scand. J. Gastroenterology 113 (1985) (herein Pilbrant), explains the scientists’ studies of the rate and conditions of PPI degradation by stomach acid. Drs. Pilbrant and Cederberg reported that the only way they obtained adequate absorption of uncoated PPI from the stomach was to require an initial ten hours of fasting in order to deplete the amount of acid in the stomach, then to drink a sodium bicarbonate solution to neutralize any remaining acid, then to drink buffered omeprazole rinsed down with sodium bicarbonate solution, followed by drinking three more doses of sodium bicarbonate solution over the next thirty minutes.
Dr. Pilbrant described various procedures whereby he attempted to avert or slow PPI degradation by stomach acid, and his conclusion that the rapid acid degradation “ruled out” an uncoated “conventional oral dosage form.” Id. at 114. Dr. Pilbrant concluded that an “enteric-coated dosage form, which does not release the active ingredient for dissolution and absorption until it has been transported down to the neutral reacting part of the small intestine, offers the best possibilities.” Id. Dr. Pilbrant recognized that the complex system whereby uncoated PPI required lengthy fasting and successive consumption of several liquid doses, was not a practical regimen for administration to patients, and his “efforts were, therefore, concentrated on developing an entericcoated granule formulation.” Id. at 115.
Despite these teachings, the panel majority holds that this Pilbrant article renders obvious Dr. Phillips’ elimination of the enteric coating. My colleagues state that Dr. Pilbrant recommended an oral uncoated suspension as the “second best choice.” Maj. op. at 1355. That is a mischaracterization, for Dr. Pilbrant made no such recommendation; he was discussing a “reference formulation” for studies of omeprazole in animals and human subjects:
The solubility and stability properties of omeprazole prevent the use of water solutions as the reference formulation in animal and human studies. A rapidly dissolving suspension of micronized omeprazole is the second best choice as the reference formulation.
Pilbrant at 116 (emphases added). Dr. Pilbrant explained why water could not be used as the reference formulation:
In animal experiments and in initial studies in man it is highly preferable to use water solutions of the drug in order to avoid influences of the dosage form on the pharmacokinetics and pharmacodynamics of the drug. Omeprazole is, however, only soluble in alkaline water solutions with physiologically unacceptable, high-pH values.
Pilbrant at 114. The Pilbrant publication stated that a liquid suspension of micronized omeprazole is second best to a water solution as an experimental reference formulation, not, as the majority incorrectly contends, that a nonenteric suspension is a usable “second best” to enteric coated forms for administration to patients. Maj. op. at 1355-56.
In determining obviousness, “a court must determine whether, at the time of the invention, a person having ordinary skill in the art would have had reason to attempt to make the composition” and “a reason *1364 able expectation of success in doing so.” Procter & Gamble Co. v. Teva Pharms. USA Inc., 566 F.3d 989, 995 (Fed.Cir. 2009). The presumption of validity under “§ 282 requires an invalidity defense to be proved by clear and convincing evidence.” Microsoft Corp. v. i4i Ltd., — U.S.-, 131 S.Ct. 2238, 2242, 180 L.Ed.2d 131 (2011). See id. at 2245 (“[T]here is a presumption of validity, a presumption not to be overthrown except by clear and cogent evidence.” (quoting Radio Corp. v. Radio Eng’g Labs., Inc., 293 U.S. 1, 3, 55 S.Ct.. 928, 79 L.Ed. 163 (1934))); Sciele Pharma Inc. v. Lupin Ltd., 684 F.3d 1253, 1260 (Fed.Cir.2012) (“The presumption of validity found in § 282 is reflected in the standard of proof required to prove invalidity, clear and convincing evidence.”).
The prior art and the expert witnesses were explicit and uniform, that benzimidazole PPIs require an enteric coating for practical oral administration to patients. Proceeding contrary to the accepted scientific knowledge is “strong evidence of non-obviousness.” W.L. Gore & Associates, Inc. v. Garlock, Inc., 721 F.2d 1540, 1552 (Fed. Cir.1983). There was no evidence contrary to the position that an enteric coating was believed to be necessary.
This is a classical example of “teaching away,” when persons in the field of the invention “would be led in a direction divergent from the path that was taken by the applicant.” Ricoh Co., Ltd. v. Quanta Computer Inc., 550 F.3d 1325, 1332 (Fed. Cir.2008). The principal reference relied on by the panel majority concluded that an “enteric-coated dosage form, which releases omeprazole for absorption in the small intestine ... offers the best possibilities.” Pilbrant, at 114-15. This conclusion was repeated in a patent of which Dr. Pilbrant is an inventor, entitled “Pharmaceutical Preparation for Oral Use.” This patent refers to the studies in the Pilbrant article, and states:
From what is said about the stability properties of omeprazole [in the article], it is obvious that an oral dosage form of omeprazole must be protected from contact with the acid reacting gastric juice in order to reach the small intestine without degradation.
U.S. Patent No. 4,786,505, col.l 11.35-39 (emphasis added). Undaunted by Dr. Pilbrant’s unequivocal statements, my colleagues creatively And that Pilbrant teaches that “suspensions of buffered nonenteric coated omeprazole ... are a viable alternative to enteric coating.” Maj. op. at 1355-56. Rather, Dr. Pilbrant reinforced the prevailing belief that the omeprazole must be enteric coated to prevent contact with acidic gastric juice.
The panel majority also cites an article by Lamers et al. entitled “Absorption of omeprazole in Zollinger-Ellison syndrome is accelerated by alkali,” published in 26 Gut 1134-35 (1985). Lamers studied the absorption into the blood of coated and uncoated omeprazole in bicarbonate and saline solutions, based on experiments involving uncoated omeprazole taken with large volumes of sodium bicarbonate solution (as did Pilbrant). Lamers stated: “We therefore conclude that addition of alkali accelerates absorption of omeprazole in patients with Zollinger-Ellison syndrome.” Lamers, like Pilbrant, did not propose that uncoated omeprazole was a viable alternative for oral administration to patients.
For years after the discovery of the benzimidazole PPI products, an enteric coating was believed to be essential for oral administration to patients. Pilbrant and Lamers and others did not change that belief; they reinforced it. The Court has cautioned against “the distortion caused by hindsight bias” and “arguments reliant upon ex post reasoning” in determining obviousness. KSR Int’l Co., v. Te *1365 leflex, Inc., 550 U.S. 398, 421, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007).
The word “must” appears throughout the literature on enteric coating for benzimidazole PPIs, all ignored by the panel majority. In earlier litigation concerning omeprazole, this court observed that “an omeprazole formulation needs a protective enteric coating.” In re Omeprazole Patent Litig., 483 F.3d 1364, 1367 (Fed.Cir.2007). Although sodium bicarbonate was known to stabilize PPI’s, it was the accepted understanding that an enteric coating was needed to avoid rapid degradation by stomach acid. For example, U.S. Patent No. 6,136,344 to Depui, issued in 2000, states:
It is well known that proton pump inhibitors are susceptible to degradation/transformation in acid reacting and neutral media. In respect of the stability properties, it is obvious that one of the active substances being a proton pump inhibitor must be protected from contact with acidic gastric juice by an enteric coating layer.
'344 patent, col.l 11.62-67.
The teachings are uniform and uncontradicted, that the PPI must be coated. These teachings surely teach away from elimination of the enteric coating in oral dosing to patients. The panel majority ignores this general knowledge and general acceptance, although it is reiterated and uncontradicted throughout the litigation record.
The references on which the panel majority relies are studies of the rate and mechanism of gastric acid destruction of the uncoated PPI. Before Dr. Phillips’ invention, no uncoated PPI formulation was achieved for patient use. The Phillips for-mutation eluded the experts, despite the extensive study of PPI degradation, despite the value and importance of PPI medications. See Unigene Labs., Inc. v. Apotex, Inc., 655 F.3d 1352, 1360-61 (Fed. Cir .2011) (“The statutory criterion is whether the invention would have been obvious to persons of ordinary skill at the time of the invention, not whether it is sufficiently simple to appear obvious to judges after the discovery is finally made.”).
My colleagues’ hindsight pronouncements of obviousness are based on their knowledge of Dr. Phillips’ achievement, an achievement that was deemed “weird” and met with incredulity. Determination of obviousness includes whether the prior art suggested, to a person of ordinary skill in the field of the invention, that the method “should be carried out and would have a reasonable likelihood of success.” Rockwell Int’l Corp. v. United States, 147 F.3d 1358, 1366 (1998) (quoting In re Dow Chem. Co., 837 F.2d 469, 473 (Fed.Cir. 1988)). The prior art shows the uniform belief that oral administration of uncoated PPI is not an effective therapeutic alternative. Dr. George Sachs[1] publicly criticized the Santarus approach:
The principle of Santarus is to give essentially, if you like, a bicarbonate or carbonate buffer to the omeprazole solution. And so you don’t have enteric coating and it comes in a gelcoat or gelcap. We thought about that a long time ago at Astra.... Man is a continuous acid secretor; the amount of acid man makes is not really predictable and so you’re not really able to particularly buffer the omeprazole solution in the stomach. So as soon as the solution *1366 starts to fall below pH 5, which would happen with a high degree of frequency, you simply destroy the omeprazole and it will no longer work. So I think the Santarus principle, though well-founded — you know, in terms of the idea of stabilizing, simply doesn’t work in man.
Trial Tr. 23:1-20; J.A. 3672; Santarus, 720 F.Supp.2d at 456.
Dr. Phillips “proceeded contrary to the accepted wisdom.... That fact is strong evidence of nonobviousness.” W.L. Gore, 721 F.2d at 1552 (citing United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966)). See also Standard Oil Co. v. American Cyanamid Co., 774 F.2d 448, 454 (Fed.Cir.1985) (“A person of ordinary skill in the art is also presumed to be one who thinks along the line of conventional wisdom in the art.”); Arkie Lures, Inc. v. Gene Larew Tackle, Inc., 119 F.3d 953, 958 (Fed.Cir.1997) (“conventional wisdom that a combination should not be made is evidence of unobviousness”).
Skepticism within the industry supports unobviousness of the invention. See Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA Inc., 617 F.3d 1296, 1304 (Fed.Cir.2010) (objective evidence of nonobviousness included “evidence of industry skepticism.”). This skepticism, reinforced in scientific commentary and conceded by the experts, leaves no doubt that an enteric coating was believed necessary for oral PPI administration. See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314, 1326 (Fed.Cir.2009) (for an obvious combination, skilled artisans must have expected that the combination would work for its intended purpose).
The record states that the Phillips formulation provides effective absorption of the PPI directly from the stomach into the bloodstream, that it achieves faster control of stomach acid, improved nocturnal acid control, dosing independent of meals, and stabilized pharmacodynamics. The direct absorption from the stomach has'the advantages of rapid and consistent bioavailability and increased effectiveness, as well as ease of administration to patients unwilling or unable to swallow capsules or tablets, as the Phillips patents explain:
[I]n their current form (capsules containing enteric-coated granules or enteric-coated tablets), proton pump inhibitors can be difficult or impossible to administer to patients who are either unwilling or unable to swallow tablets or capsules, such as critically ill patients, children, the elderly, and patients suffering from dysphagia.
'772 Patent, col.71.65-col.8 1.4.
These advantages are reflected in the Santarus sales growth of Zegerid® from $46 million in 2006 to over $100 million in 2008. The record states that numerous companies took a license to the Phillips patents. Evidence of “how the patented device is viewed by the interested public: not the inventor, but persons concerned with the product in the objective arena of the marketplace” is “highly probative of the issue of nonobviousness.” Arkie Lures, 119 F.3d at 957. In Ashland Oil, Inc. v. Delta Resins & Refractories, Inc., 776 F.2d 281, 306 (Fed.Cir.1985), this court observed that: “Secondary considerations may be the most pertinent, probative, and revealing evidence available to the decision maker in reaching a conclusion on the obviousness/nonobviousness issue.”
The uniform belief was that an enteric coating is necessary for oral administration of PPIs to patients. Despite this universal skepticism, my colleagues on this panel find Dr. Phillips’ invention obvious to them. I respectfully dissent.

. The record states that Dr. Sachs was awarded the Beaumont Prize, one of the highest honors of the American Gastrological Association, and was described at the trial as "the dean of PPIs." See Altana Pharma AG v. Teva Pharms. USA Inc., 566 F.3d 999, 1009 (Fed. Cir.2009) (stating that Dr. Sachs "is one of the leading researchers in the PPI development field").